Okay, thank you, Ms. Carpenter. Good morning, owners. My name is Venetia Carpenter-Asui and I represent the plaintiff appellant in this case. This is a case of retaliation and this case was dismissed at the summary judgment stage. And the issue is whether the district court erred in dismissing the case because we believe we have sufficient evidence to I believe that the facts of Pollen v. Chertoff are very similar to the case of Mr. Legronio here. He engaged in protected activity when he filed a EEO complaint against his supervisors and that case was settled by a settlement agreement. Immediately thereafter and before the settlement agreement was even signed, the same people he had filed the discrimination case against, Manager Netto, Detective Brose, and Detective Breedlove, three Caucasian males, continued to retaliate against him for filing the initial EEO complaint. And we've detailed, it's pages and pages of retaliation that are documented and are attested to in our excerpts of record. We have these two cases, Vasquez and Pollen. In both cases there was an investigation. Vasquez, the court said, there's an independent investigation so therefore it doesn't matter that one of the people interviewed had the alleged retaliatory animus or discriminatory was deemed to be tainted by the individual with a discriminatory animus. Can you explain in this case whether this case is, why this case is more like Pollen than Vasquez? There was an independent investigation by Mason and the decision makers who ultimately reached the decision were not related to the alleged discriminatory animus. Yes, Your Honor, that's true. The letter that informed Mr. Ligonier that he would be suspended for 14 days immediately upon his return to work did come from someone other than the three individuals who had been retaliating against him, but that decision to suspend him for 14 days was based on the same individuals who had retaliated against him, who had accused him of committing workplace violence. And as the record reveals and the witness statements show, Mr. Ligonier just stood there mute while a co-worker spoke with the manager. And on the second instance, the manager saw him coming out of a doorway. So there really was no basis for accusing him of workplace violence. There is, in the letter that informs him he'll be suspended for 14 days immediately upon his return to work, but you have the witness statements who say they were right there in the room when that supervisor who retaliated against him informed him about the workplace violence investigation and he said nothing. The witness statements say Mr. Ligonier again stood there mute. And it was Donna Kressinger who had been heard, the manager that he was standing there witnessing the altercation with who had said, I'll make your life a living hell. Never Mr. Ligonier. So at all times, the allegations are supported by witness testimony that Mr. Ligonier. But what is it that makes Ms. Mason's investigation less than independent? I mean, regardless of what the actual truth of the matter is, if she did an independent investigation, reached conclusions, untainted by any animus against Mr. Ligonier, why isn't that case then more like Vasquez? Well, we would argue that the investigation was heavily influenced by the three Caucasian supervisors who he had complained about initially with the race discrimination complaint and who he had complained again on two occasions after that to the EEO about retaliation. So based on the information they were providing and the background that they were providing and the information they were providing and the documents they were providing, ultimately Well, if that's true, how would you, how would anybody ever investigate something? Because if you follow that to its logical extreme, you would never talk to anybody who was recipient to any incident. Yes, Your Honor. But we are alleging that at the summary judgment stage, we had enough evidence and we had enough witness statements, written statements that were included in the EEO report that rebuffed all of the agency's allegations against Mr. Ligonier. There were questions of fact as to each allegation against him that should have been resolved by a trier of fact and not at the summary judgment stage. But didn't Mason talk to, I'm just trying to look at who she interviewed, it says Kretzinger, Netto, Vincent, Ligonier, Irvine, Tupuola, and a janitor. So she didn't just interview the people, in fact it doesn't say she interviewed Breedlove and Ambrose, so she didn't just interview people who had the alleged animus, she interviewed people who were supporting Mr. Ligonier's testimony as well and yet concluded that he had made the threat and refused to Yes, she did make that determination. However, there are statements, page 39 of our excerpts of record, a detective, Alfred Irvine, who was present when Mr. Ligonier was alleged to have made the threat and he said that Mr. Ligonier said absolutely nothing, he just stood there mute and it was manager Kretzinger who was constantly saying she would make Mr. Ligonier's life a living hell. I guess my question is because Mason apparently interviewed Mr. Irvine as well in doing her investigation, if Mason, who is now alleged to have discriminatory animus, did an interview of a range of witnesses and then independently reached a decision, yes, Mr. Ligonier should be fired, right or wrong, it seems that that decision, which was then taken up by the superiors who are also now alleged to have discriminatory animus, is not, as in Vasquez, you can't say that was discriminatory motivation that led to the adverse action. Yes, Your Honor, I understand that, but my argument is that at the summary judgment stage when you have witnesses that are saying white and you have witnesses that are saying black, witnesses that are saying no threatening statements were made and witnesses that are saying threatening statements were made, then that's something that needs to be determined on the basis of credibility. It's not like he showed up with no witnesses, it's not like he has no witness statements. There are affidavits here in the record that said he didn't do anything wrong, that he said not a word, and you have the complainants complain that he stood there and said nothing. So the only conclusion that you can reach is that there's some other motive for finding he is deserving of a 14-day suspension for workplace violence, and that it's logical to follow from the years of retaliation that are well documented on at least three or four EEO complaints. And I don't have evidence that Mr. Breedlove, Mr. Netto, or Mr. Brose went to the EEO and somehow influenced the EEO investigator. I don't have that kind of evidence, but I do have evidence in the EEO record where the EEO investigator acknowledges that there was testimony favorable to Mr. Regronio. So how she reached her conclusion, I don't know. But there was a question of fact in the evidence that was before the district court that there were independent persons who were in the room and said no threats were ever made. But was there any evidence that the terminate or the adverse action decision was made by somebody with discriminatory animus? I can't prove that up the chain of command, whoever typed that memo and signed that memo had discriminatory animus toward Mr. Regronio. I can only prove that there were questions of fact that should have been matters for the jury. The district court completely made no mention whatsoever, basically found there was no adverse action, and never made any mention of this impending 14-day suspension. And that's significant. Assuming that the suspension was an adverse employment action, and assuming that his 2002 EEO complaint was protected activity, the government's reason for the suspension is that he committed workplace violence and he didn't leave, he was insubordinate because he didn't leave for five hours after having been told to leave. My question is, I can't find any argument in the brief that that reason is pretextual. You assert that it's pretextual because it's unreasonable, but you don't develop the argument at all. So in your view, why doesn't that answer the question without the need to worry about the prima facie case? Well, Your Honor, Mr. Regronio, the reason he didn't leave right away is because he was xeroxing these witness statements. They were all told to write a statement in the room and he got a hold of them and he xeroxed them. If we didn't have them, we wouldn't be here in court today. So he may have been insubordinate in xeroxing the witness statements in his favor and not leaving immediately as he was told, but certainly that is not deserving of 14-day suspension. And the primary reason is not because he was insubordinate and not leaving promptly enough. The reason was because he had allegedly committed workplace violence and we have witness statements that said he never said such a thing. And even Manager Krebsinger's statement in the record says the guy just is standing there. He never said a word. Her conversation was with someone else. And so whether this deserves a 14-day suspension, standing there saying nothing, and xeroxing witness statements that are in the record here today that support that he just stood there doing nothing, were questions of fact that a jury could have found there was some retaliatory motive on the employer's part. That's our argument. Okay. We'll get back to you, Abby, when we hear from Mr. Halpern. Good morning. May it please the Court? I think that the key distinction between Vasquez and Krebsinger is in motion a proceeding by an independent decision-maker. And I think that's the key verb phrase, whether the subordinate, in this case Mr. Netto, set in motion the chain of events that led to the suspension. In this case he didn't. It was Ms. Krebsinger's complaint that started the process that led to the suspension. And so the fact that Mr. Netto was involved and was a witness simply brings this case back into Vasquez because Vasquez, the supervisor, similarly wasn't the allegedly biased supervisor, was an important, indeed the key witness, I think more important than Mr. Netto was in this case. But I don't think he set in motion or instigated the chain of events that led to the disciplinary action. There's some other language in Poland also which says that the allegedly independent adverse action was not actually independent because the biased subordinate influenced, affected, or was involved in the adverse employment decision. So extremely broad language. Why wasn't Mr. Netto at least involved in the employment decision, influenced, affected, or was involved in at least in making reports to the investigator? Why doesn't that bring it within Poland? I think if that's the standard, I think he was. I don't think there's any way to distinguish that. He was a witness. They relied in part. But I think that just goes beyond the holding and it sweeps way too broadly because what that says is really you can never have an independent investigation if there's anybody involved in the investigation who arguably has a discriminatory motive. Any witness whose decision or whose testimony may have had an influence on the ultimate decision, no matter what steps the employer goes through to remove that, the taint, you can't do it because there's a possibility that that witness is lying and that his lie is influenced by his discriminatory motive. So I think that goes, I think that sweep, that broad language is impossible to reconcile with the courts holding in baskets. So I think that the sets in motion language and the holding is what the real rule of Poland is. And I think as the court has recognized, there is, or I suggest in its questions, and I think counsel has conceded, there's no evidence that any of the decision makers up the chain were in fact biased, Ms. Essex, who ultimately wrote the letter imposing the suspension. I also want to turn to my second argument, and this is not a matter reached by the district court, but I think it supports the district court's ultimate conclusion, which is that this is not in fact an adverse personnel action. A suspension that is served is clearly or can be an adverse personnel action. But under the Brooks case, let me actually walk through the timeline briefly. First, in this case, the alleged workplace violence occurred in August of 2003. In November, after the investigation, a plaintiff was issued an advance notice of suspension, inviting him to respond, saying we're going to suspend you, but we want to hear what you have to say. And all the documents I'm about to cite are in the excerpts of record at 174 to 178. He didn't reply to that. And so they went ahead in December and issued a notice of suspension. But the notice said, you have the right to file a grievance on this if you want to challenge it. And in fact, the plaintiff did file a grievance, and that's indicated by, I think it's ER 176, which is the latest document in the record. And that says, it's a notice to the hearing examiner that says, here's the grievance. And by the way, he hasn't even served the suspension yet because he's on leave without pay right now. And it's undisputed that, in fact, he never did serve the suspension. Well, what do we do about Burlington Northern then? Because Burlington seems to be either overrule or be in tension with Brooks. In that case, I think the employee ultimately was reinstated and awarded back pay. But the Supreme Court said, nevertheless, it was an adverse action. I don't think that Burlington really had an effect on the Ninth Circuit standard that was already in effect at the time that Brooks was decided, which is the Ray versus Henderson standard, which basically says that any action which can deter a reasonable person from pursuing their rights under Title VII is an adverse action. And Ray versus Henderson is cited and distinguished in Brooks. Brooks, the principle we're citing Brooks for, has been cited by district courts for the principle we're citing it for since Burlington, without any indication that Burlington overrules it. I don't believe the Ninth Circuit has cited Brooks for that proposition in my research. District courts in the Ninth Circuit have cited Brooks as good law. And how does Brooks survive Burlington Northern? Brooks essentially said, if the action is not completed yet, then it's not an adverse action, whereas Burlington has very broad language. Well, I think Burlington, on its face, the person actually served the suspension. And so there was no, the punishment was actually imposed and then there was an appeal pending and then she was reinstated and got back pay. Right, but she did, in fact, suffer the adverse consequences, even though they made up some of it, the back pay portion of it, she did suffer the consequences. And I think in this case, there was no suspension actually served. And I think that that's, assuming that Brooks is good law, that this is directly on point, because as in Brooks, it's the adverse employment action. It was not an adverse employment action because it was subject to modification by the city. She refused to accept the review and appealed, but she abandoned her job while the appeal was pending. And same thing here. While the appeal was pending, Mr. Lagornio stopped coming to work. And as a result, the appeal was never resolved. So I think that, assuming Brooks remains good law, it's directly on point in controlling. I think that's all I have unless the court has additional questions. I don't think so. Thank you, Mr. Helper. Thank you. Ms. Carpenter. Thank you, Honors. As to Kressinger, she was the root of this last in a long string of retaliatory actions, adverse actions, we argue. And she had an improper motive for going after Mr. Lagornio because he had caught her on video stealing palm trees, and he reported it. And Netto, Breedlove, and Rose told him, stop investigating her. She's a manager. You can't do this. And he continued to videotape her and her husband coming up the back door, loading these palm trees on their private vehicle, and the husband taking off with them. After he turned her in for that, she now jumps in cahoots with these three managers and starts this bogus workplace violence allegation. She doesn't actually accuse him of workplace violence. She submits in her complaint that he did just stand there, and she felt afraid. And then he walked out of his office, and she saw him in the hallway, and she felt afraid. She doesn't say he's grimacing at her or staring at her or watching her or doing anything like that. She just sees him, and she's afraid. And Mr. Lagornio is a very tiny little man, and that's Excerpts of Record 34. And then Netto, who is the primary instigator, runs with it, and then he confronts Lagornio and says you're going to be transferred to this other store to work under this guy who he had turned in for racial discrimination, which terrified Mr. Lagornio. And then Netto accuses Mr. Lagornio in that meeting of making the threat against Kretsinger, which the co-workers say we were right there. It's a tiny little room, a loss prevention room, and Mr. Lagornio didn't say a peep. So we can't exactly say this is an outside incident. Kretsinger has every reason to want to get back at Mr. Lagornio for turning her in for theft. And there's somehow some kind of a connection because these three Caucasian males tell him stop. You can't investigate her. And the next thing you know, she comes right back with this allegation that he had stood there and she felt afraid. And even though Mr. Lagornio didn't actually go out of work on a 14-day suspension, we'd argue it's somewhat like a constructive discharge situation. He's filing these retaliation complaints. Nobody's doing anything. He's still working under the direct supervision of these three individuals. Now he's brought up on trumped-up charges that are absolutely false. He has witness statements that he never said or did any such thing. And he is still, and now it's escalating to a 14-day suspension. So we would argue under those circumstances, no reasonable person would want to continue working there. Thank you. Thank you, Ms. Carpenter. Thank you, counsel. The matter just argued will be submitted, and the court will take a recess before hearing the final matter on calendar by video.
judges: Goodwin, Rymer, Ikuta